# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Parenting
and Support of:

Daniel Rainbow

NATHAN BRASFIELD,

                Appellant,

      and

LAUREN ELIZABETH RAINBOW,

                Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 74018-1-I

UNPUBLISHED OPINION

FILED: October 17, 2016

DWYER, J. — Nathan Brasfield appeals four trial court orders: an order modifying the parenting plan between Brasfield and Lauren Rainbow, an order entering a permanent parenting plan, an order granting an extension of Rainbow's existing order of protection against Brasfield, and an order denying Brasfield's motion for partial summary judgment on the matter of attorney fees. Finding no error, we affirm.

I

Brasfield and Rainbow met in 2008, began living together in 2009, and were separated by June 2010. The parties have one child together, Daniel Rainbow (Danny). After they separated, Brasfield and Rainbow orally agreed to a parenting plan that provided Brasfield with shared parental responsibility over

Danny. The oral agreement did not require either party to pay child support to the other and, in exchange, Rainbow was given exclusive use of a car jointly owned by the parties. In May 2012, Rainbow obtained a court order for child support. In June of that year the parties agreed to a formal, temporary parenting plan that provided Brasfield with shared parental responsibility over Danny.

In April 2014, Rainbow cooperated in an FBI investigation of Brasfield that ultimately led to his arrest on April 22, 2014. Shortly after Brasfield's arrest, and at least partially in response to Brasfield's conduct upon learning of her cooperation with the FBI, Rainbow filed a pro se petition seeking a domestic violence protection order (DVPO). The DVPO was entered on June 3, 2014. Rainbow also petitioned for a modification to the parenting plan, seeking to eliminate the rights to visitation and decision-making previously afforded to Brasfield. Brasfield, represented by counsel, voluntarily agreed to the entry of the June 3 DVPO, but later moved for summary judgment seeking a determination that the incidents supporting issuance of the DVPO did not constitute domestic violence as a matter of law. The motion, including a request for an award of attorney fees, was denied.

In December 2014, the trial court appointed a guardian ad litem (GAL) to represent Danny's interests and investigate specific issues for trial. On March 31, 2015, Brasfield entered a federal court guilty plea to being a felon in possession of a firearm and was sentenced to 48 months in prison.

In May 2015, Rainbow filed a petition seeking renewal of the June 2014 DVPO. In anticipation of trial, the court consolidated the petition to renew the DVPO with the petition to enter a permanent parenting plan.

During trial, the court heard extensive testimony over five days. Rainbow, Brasfield, Brasfield's parents, the GAL, and various lay witnesses all testified, as did Rainbow's expert witness, Danny's therapist Jenna Genzale.

After trial, the court entered a number of factual findings and legal conclusions, ruling that parenting restrictions pursuant to RCW 26.09.191[1] were appropriate. In reaching this conclusion, the court considered—but ultimately rejected—suggestions made by the GAL, including the GAL's opinion that Brasfield's parents were appropriate supervisors for Danny and that Danny would benefit from visitation with his father during Brasfield's incarceration. The permanent parenting plan entered by the court provides Brasfield no visitation with Danny during his incarceration, and provides for professionally supervised visits following his release. The trial court also entered an order renewing the DVPO, with an expiration date of September 1, 2020. Brasfield appeals.

II

Brasfield challenges the trial court's admission of certain testimony and exhibits.

We review a trial court's admission of evidence for abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). An error in the

---

[1] RCW 26.09.191(1) and (2) requires the trial court to limit mutual decision-making and residential time if a parent has engaged in domestic violence. Subsection (3) permits the court to limit any provision of the parenting plan if it is in the child's best interests.

admission of evidence requires reversal when the error is prejudicial. Carnation Co. v. Hill, 115 Wn.2d 184, 186, 796 P.2d 416 (1990). An error is prejudicial if it has a substantial likelihood of affecting the outcome of the case. Hill, 115 Wn.2d at 186.

However, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike is made, stating the specific ground of objection." ER 103(a)(1). We may decline to review claims of error which were not raised in the trial court. RAP 2.5(a).

A

Brasfield first asserts that the trial court erred by admitting the expert testimony of Genzale, a therapist Danny had seen prior to trial. The trial court erred, Brasfield contends, because the judge never determined that Genzale was qualified to testify as an expert and because Genzale's testimony was inadequate given that she had never met Brasfield and never visited the prison in which he was incarcerated.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ER 702. "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." ER 703. In determining whether expert testimony is admissible, trial courts are

afforded broad discretion and rulings admitting or excluding such testimony will not be disturbed on appeal absent an abuse of such discretion. In re Marriage of Katare, 175 Wn.2d 23, 38, 283 P.3d 546 (2012). If the basis for admission of the evidence is "'fairly debatable,'" we will not disturb the trial court's ruling. Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue, 106 Wn.2d 391, 398, 722 P.2d 787 (1986) (quoting Walker v. Bangs, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979)).

At trial, before offering opinion testimony, Genzale testified to her qualifications and education. Brasfield then objected to the admission of Genzale's expert testimony on the ground that he had not received a summary of her testimony prior to trial. This objection was overruled after the court determined that Brasfield received a witness list identifying Genzale as an expert witness and that Brasfield never requested a summary of her opinions. Genzale then testified that she had diagnosed Danny with generalized anxiety disorder and that it was her opinion that Danny might be harmed by visits to a prison. Brasfield never objected to Genzale's qualifications to testify as an expert regarding a diagnosis of generalized anxiety disorder. Nor did Brasfield object on the basis that Genzale's testimony was factually premised on a basis not authorized by ER 703.

On appeal, Brasfield asserts that the trial court erred by never ruling that Genzale was qualified to testify as an expert. This assertion is without merit. Brasfield did not object to Genzale's qualifications at trial and, consequently, the

trial court was never called upon to rule that she was qualified to testify as an expert.

Brasfield also asserts that Genzale's diagnosis and her opinion that it would not be in Danny's best interests to visit his father in prison were based on insufficient facts. This is so, he contends, because Genzale had never met Brasfield and had never seen the visitation room in the prison where Brasfield is incarcerated.

Brasfield did not object on this basis at trial. Therefore, we need not entertain his objection on appeal. Brown v. Labor Ready Nw., Inc., 113 Wn. App. 643, 655, 54 P.3d 166 (2002). However, even if we did, Brasfield would not prevail on the merits. Genzale testified that she diagnosed Danny with generalized anxiety disorder based on 10 to 12 one-hour sessions with him, providing her with sufficient information on which to base her diagnosis. Brasfield's present assertions go only to the weight to be given to Genzale's testimony, not to its admissibility. The trial court was free to credit Genzale's testimony.

B

Brasfield next asserts that the trial court erred by relying on hearsay evidence in rendering its findings of fact.

"A trial court's determination that a hearsay exception applies is judged on an abuse of discretion standard." Magers, 164 Wn.2d at 187. An error in the admission of evidence requires reversal when the error is prejudicial. Hill, 115

Wn.2d at 186. An error is prejudicial if it has a substantial likelihood of affecting the outcome of the case. Hill, 115 Wn.2d at 186.

A GAL may properly rely on hearsay evidence when making a recommendation to the court. In re Guardianship of Stamm, 121 Wn. App. 830, 837, 91 P.3d 126 (2004). However, "[t]he GAL's testimony must not be used as a vehicle to present and reiterate otherwise inadmissible hearsay." Stamm, 121 Wn. App. at 838.

Brasfield assigns error to the trial court's factual findings that there were firearms in Brasfield's house that were "unlocked and/or otherwise [un]secured from Danny" and "loaded guns in a duffle bag on the floor." The first of these findings—that there were firearms in Brasfield's house that could have been accessible to Danny—was based on the testimony of Brasfield's father. The context of the trial court's opinion, however, makes it clear that the court was not considering opinions expressed by Brasfield's parents for the truth of the matter asserted but, rather, was opining on the suitability of Brasfield's parents as potential supervisors for Danny. The trial court noted that Brasfield's father was "surprised" when he learned that his son had firearms in an unlocked closet, but that he still "does not believe Nate was reckless with Danny's safety." The trial court found that Brasfield's mother displayed a similar disregard for Danny's safety, noting that she was "unwilling to accept the undisputed facts about her son and the dangerous situations to which Danny was persistently exposed." The trial court found particularly troubling Brasfield's mother's testimony that she refused to reveal to Rainbow where Brasfield was living because she did not

want to break her word to her son—testimony that showed that she is "willing to put her 'word' to her son above the safety and well-being of Danny." The testimony of Brasfield's parents formed part of the court's determination that they were unsuitable supervisors and was not inadmissible evidence when considered for that purpose.

With regard to the trial court's finding that the FBI located "loaded guns in a duffle bag on the floor," however, the trial court did consider inadmissible hearsay evidence. As an initial matter, this finding is not supported by the record before us. Rather, the finding is supported by the FBI report and the GAL report, neither of which were admitted at trial for the truth of the statements therein.[2] The FBI report identified various guns and drug paraphernalia discovered in Brasfield's home. The GAL report contained hearsay statements regarding what the FBI found in Brasfield's home. Thus, although the trial court did not admit either report for the truth of the matters stated therein, its findings relied on those reports for that purpose.

Nevertheless, there is no possibility that this error affected the outcome of the case. Substantial evidence supports the trial court's other factual findings and the facts found amply support the court's conclusions.

III

Brasfield next contends that the trial court abused its discretion by concluding that RCW 26.09.191 restrictions in the permanent parenting plan

---

[2] The trial court admitted the FBI report into evidence to show Rainbow's motive for seeking a DVPO and parenting plan, not for the truth of the matters asserted therein.

were appropriate. This is so, he asserts, because the trial court's finding of domestic violence, warranting the restrictions in the parenting plan, was not supported by substantial evidence.

We review a trial court's ruling entering a parenting plan for abuse of discretion. In re Marriage of Kovacs, 121 Wn.2d 795, 801, 854 P.2d 629 (1993). A court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). A decision is manifestly unreasonable "if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." Littlefield, 133 Wn.2d at 47. We do not review the trial court's credibility determinations or weigh conflicting evidence. In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996). "Findings of fact supported by substantial evidence, i.e., evidence sufficient to persuade a rational person of the truth of the premise, will not be disturbed on appeal." State ex rel. J.V.G. v. Van Guilder, 137 Wn. App. 417, 423, 154 P.3d 243 (2007).

A

Brasfield asserts that substantial evidence did not support the trial court's conclusion that Brasfield's actions toward Rainbow constituted domestic violence, as defined by statute.

"Substantial evidence exists so long as a rational trier of fact could find the necessary facts were shown by a preponderance of the evidence." In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). "The fact that the evidence may be subject to different interpretations does not authorize this court to substitute its findings for those of the trial court." Peter L. Redburn, Inc. v. Alaska Airlines, Inc., 20 Wn. App. 315, 318, 579 P.2d 1354 (1978).

In adopting a parenting plan, the trial court must consider a variety of applicable provisions in the Parenting Act, including RCW 26.09.191, which sets forth a number of limiting factors that require or permit restrictions of a parent's actions or involvement with a child. Littlefield, 133 Wn.2d at 52. "[T]he court may not impose limitations or restrictions in a parenting plan in the absence of express findings under RCW 26.09.191." In re Marriage of Katare, 125 Wn. App. 813, 826, 105 P.3d 44 (2004). "Mere accusations, without proof, are not sufficient to invoke the restrictions under the statute." In re Marriage of Caven, 136 Wn.2d 800, 809, 966 P.2d 1247 (1998).[3]

Pursuant to RCW 26.09.191(1) and (2), a trial court is required to limit a parent's residential time with the children if that parent has engaged in certain conduct, including having "a history of acts of domestic violence as defined in RCW 26.50.010(1)."

Domestic violence is defined as:

(a) Physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, between family or

---

[3] Brasfield wrongly contends that such restrictions must be reviewed pursuant to a strict scrutiny analysis. To the contrary, a parenting plan that "complies with the statutory requirements to promote the best interests of the children" does not violate either parent's constitutional rights. Katare, 125 Wn. App. at 823 (holding that a strict scrutiny analysis was not appropriate).

household members; (b) sexual assault of one family or household member by another; or (c) stalking as defined in RCW 9A.46.110 of one family or household member by another family or household member.

RCW 26.50.010(1).

Although "a history of acts of domestic violence" is not defined, the phrase "was intended to exclude 'isolated, de minimus incidents which could technically be defined as domestic violence.'" In re Marriage of C.M.C., 87 Wn. App. 84, 88, 940 P.2d 669 (1997) (quoting 1987 PROPOSED PARENTING ACT, REPLACING THE CONCEPT OF CHILD CUSTODY, Commentary and Text 29 (1987)), aff'd, 136 Wn.2d 800, 966 P.2d 1247 (1998).

At trial, both Rainbow and Brasfield testified as to their personal history and experiences co-parenting Danny. In her testimony, Rainbow conceded that Brasfield had never attempted or carried out any actual physical violence against her or Danny.

Rainbow did testify, however, to several incidences over the course of their relationship that caused her to fear Brasfield. One such incident occurred after a heated telephone call between Rainbow and Brasfield, in which Brasfield demanded that Rainbow drop her demands for child support. Rainbow testified that Brasfield threatened her and that she had called the police as a result, stating, "Nate told me, quote, drop the child support or see what's coming to you. I responded, are you threatening me? Nate responded, you figure that out, B-I-T-C-H. I said, Nate you are not allowed to threaten me, I'm going to call the police." Later that night, Brasfield sent an individual to Rainbow's house to take

-11-

away the car—and all of Rainbow's personal property inside the car—without Rainbow's knowledge or permission.

Later, Rainbow became aware of a Facebook posting in which Brasfield had written, "[a]gain, it wasn't Laurens [sic] car. Her interest in it was void the moment she failed to honor the agreement we had. Considering what she tried to do, *she's lucky that's all I did.*" (Emphasis added.)

Rainbow also became aware of an e-mail from Brasfield to his mother. This e-mail included the following statements:

- "I can't parent Danny. I have way too much anger built up towards his mom, and I don't see it ever going away."

- "If you decide to talk to Lauren, please tell her that I will not harm her. Tell her that I've thought about it many times, and every time I think about it, I have to decide if Danny's better off having a mom or a dad."

- About his sister, Brasfield wrote: "She's betrayed my trust, sent Lauren a lot of stuff that was never meant for her to see, and quite possibly provided Lauren with the evidence she needed to get the FBI to raid my house. At this point, she's dead to me too."

At trial, Rainbow, pro se, questioned Brasfield regarding the incident with the car:

> Q: Do you recall a phone call in which we were discussing child support in which you told me to drop the child support, or I would see what was coming to me?
>
> A: I don't believe that was the language I used. But I remember talking to you about child support, demanding that you drop it, and telling you that if you didn't, that you'd need to return the car.
>
> Q: Okay. You do not recall saying, "see what's coming to you"?

A: No, I don't.

Q: Okay. Do you remember me asking you if you were threatening me?

A: Yeah, I do.

Q: Do you remember what your response was?

A: Yeah, I think my response was, "you figure it out".

Throughout the trial, Rainbow testified to her growing and continuing fear for her life based on her interactions with Brasfield, stating, "[m]y continued fear of Nate, even though he's in prison at this time, is that he certainly would not hesitate to send someone over to hurt me," and "I have tried very hard, and it has resulted in threats, and retaliation, and . . . now I have a fear for my life when it comes to Nate Brasfield."

Rainbow was entitled to rely on her personal knowledge of Brasfield's dangerous capabilities when she was confronted with threats and demonstrations of force, including her knowledge of the reasons for his present incarceration and previous felony convictions. Rainbow testified to multiple incidences in which Brasfield lost his temper and destroyed his own and others' personal property. Rainbow testified to multiple incidents in which Brasfield endangered her life and the lives of others after losing his temper. Although Brasfield often couched his threats in language indicating that he would not follow through on them, Rainbow's own experiences with Brasfield reasonably led her to fear otherwise.

Rainbow testified to a *continuous* fear of imminent harm. That Brasfield was able to send someone to Rainbow's house in the middle of the night, immediately after threatening her, demonstrates his capacity to have third parties

do his bidding. Thus, his incarceration did not negate the danger he posed. The multiple, serious threats to Rainbow's safety, along with Brasfield's demonstrated ability to carry out those threats from a remote location, inflicted on Rainbow a continuous fear for her safety—consistent with the statutory language of "infliction of fear of imminent physical harm, bodily injury or assault." RCW 26.50.010(1). Although Brasfield disagrees with the trial court's finding that Rainbow's testimony regarding her fear was credible, we do not reweigh the evidence on appeal. Substantial evidence supports the trial court's determination. There was no abuse of discretion.[4]

B

Brasfield further contends that the trial court erred by concluding that visitation at the prison, even if supervised by Brasfield's parents, would not be in Danny's best interests. He asserts that the trial court abused its discretion by relying on witness testimony that conflicted with the GAL's findings. But the trial court is free to credit or not credit evidence as it sees fit. There was no error.

The GAL's charge is to investigate the child and the family situation and make recommendations.

> In effect, she acts as a neutral advisor to the court and, in this sense, is an expert in the status and dynamics of that family who can offer a commonsense impression to the court. But the court is also free to ignore the guardian ad litem's recommendations if they are not supported by other evidence or it finds other testimony more convincing.

---

[4] The restrictions in the parenting plan entered by the trial court were entered pursuant to RCW 26.09.191(1), (2), and (3). Because substantial evidence exists supporting the trial court's findings of domestic violence—and a finding of domestic violence is alone sufficient to impose RCW 26.09.191 restrictions in a parenting plan—we need not reach the trial court's other bases for imposing the restrictions.

Fernando v. Nieswandt, 87 Wn. App. 103, 107, 940 P.2d 1380 (1997).

The GAL made a number of findings and recommended to the court that Danny be allowed to visit his father in the prison's visitation room under the supervision of Brasfield's parents.

The trial court found that visitation at the prison would be contrary to Danny's best interests. In so concluding, the trial court credited testimony from several individuals, including Genzale, Rainbow, and Danny's school principal, Candace Mangum. The trial court also found, after hearing testimony from Brasfield's parents, that Brasfield's parents were unsuitable supervisors for Danny.

Contrary to Brasfield's assertions, substantial evidence supports the trial court's findings, including the grandparents' own testimony. Although the trial court considered the findings and recommendations of the GAL, the court was not bound by the GAL's recommendations or evaluation of the facts. Fernando, 87 Wn. App. at 107. While Brasfield may not agree with the trial court's assessment of the evidence, substantial evidence exists to support these findings and we will not reweigh the evidence on appeal.

IV

A

Brasfield next argues that the DVPO extension entered by the trial court must be vacated. This is so, he asserts, because the DVPO "mirrors" the parenting plan restrictions and the existence of a DVPO may not be the basis for the terms of a parenting plan.

Although it is true that the issuance of a DVPO cannot serve as the basis for restrictive terms in a parenting plan, In re Marriage of Stewart, 133 Wn. App. 545, 554, 137 P.3d 25 (2006), there is no evidence that the reissued DVPO herein affected the restrictions imposed in the permanent parenting plan ordered by the trial court.

The trial court specifically acknowledged, in response to Brasfield's objection, that a finding of domestic violence could not be predicated on the existence of the DVPO. Indeed, the renewed DVPO here at issue incorporates the restrictions found in the parenting plan, not the other way around. This is unremarkable, given that the motions for modification of the parenting plan and extension of the DVPO were consolidated for trial. There is no evidence to support the assertion that the trial court relied on the existence of the DVPO to support its finding of domestic violence as a basis for imposing RCW 26.09.191 parenting plan restrictions.

B

Brasfield also contends that the DVPO extension must be vacated because it exceeds one year in duration. RCW 26.50.060(2) provides, "[i]f a protection order restrains the respondent from contacting the respondent's minor children the restraint shall be for a fixed period not to exceed one year."

Although a one-year limitation applies to initial protection orders, no such limitation applies to renewals of protection orders issued pursuant to chapter 26.50 RCW. The pertinent statute provides,

> If the court grants an order for a fixed time period, the petitioner
> may apply for renewal of the order by filing a petition for renewal at

any time within the three months before the order expires. . . . The court shall grant the petition for renewal unless the respondent proves by a preponderance of the evidence that the respondent will not resume acts of domestic violence against the petitioner or the petitioner's children or family or household members when the order expires. *The court may renew the protection order for another fixed time period or may enter a permanent order as provided in this section.*

RCW 26.50.060(3) (emphasis added). It does not follow that a trial court is permitted to enter a permanent order upon renewal, but not an order with a five-year durational period.

The DVPO in question was a renewal. The statute sets no durational restrictions for renewals. The trial court did not err.

V

Brasfield contends that the consolidation of the parenting plan petition and the DVPO petition into a single trial resulted in an unconstitutional denial of due process.

Brasfield did not object to consolidation of the hearings in the trial court. Nevertheless, he contends that review is appropriate because the trial court's decision to consolidate the hearings was a manifest error affecting a constitutional right, excusing his failure to raise the issue at trial.

RAP 2.5(a) provides that "[t]he appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right." There are four steps in analyzing an alleged constitutional error raised for the first time on appeal:

"First, the reviewing court must make a cursory determination as to whether the alleged error in fact suggests a constitutional issue. Second, the court must determine whether the alleged error is manifest. Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case. Third, if the court finds the alleged error to be manifest, then the court must address the merits of the constitutional issue. Finally, if the court determines that an error of constitutional import was committed, then, and only then, the court undertakes a harmless error analysis."

City of Seattle v. Heatley, 70 Wn. App. 573, 585, 854 P.2d 658 (1993) (quoting State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)).

In considering whether to issue a DVPO under chapter 26.50 RCW, courts need not apply the rules of evidence. ER 1101(c)(4). However, under the Parenting Act, courts must apply the rules of evidence when considering restrictions in a parenting plan. RCW 26.09.191(6). Further, consolidation of a hearing on a parenting plan with a hearing on a DVPO is expressly permitted under RCW 26.50.025. Nevertheless, Brasfield contends that the trial court relied on hearsay evidence in making its findings of fact and, thus, consolidation of the hearings was a manifest constitutional error that violated his right to due process.

Essential to a determination of manifest constitutional error, providing the basis for review under RAP 2.5(a)(3), is a plausible showing by the claimant that the error had practical and identifiable consequences in the trial of the case. Heatley, 70 Wn. App. at 585. It is not sufficient when raising a constitutional issue for the first time on appeal to merely identify a constitutional issue. "The appellant must first make a showing how, in the context of the trial, the alleged error actually 'affected' the defendant's rights. Some reasonable showing of a

likelihood of actual prejudice is what makes a 'manifest error affecting a constitutional right.'" Lynn, 67 Wn. App. at 346 (quoting RAP 2.5(a)(3)).

As discussed herein, although the trial court did consider some hearsay evidence during trial, the admissible evidence credited by the court amply supports the court's ruling. The consideration of some hearsay evidence did not change the outcome of the trial and Brasfield has made no showing that the consolidation of the hearings into a single trial had any practical and identifiable consequences that affected the outcome. Thus, Brasfield has not shown a manifest constitutional error that he may object to for the first time on appeal.

But Brasfield's claim has yet another fatal failing. Three distinct factors must be considered when reviewing a due process claim:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

In asserting that an unconstitutional denial of due process resulted from the consolidation of the hearings, Brasfield argues only the first of the three Mathews factors: that Brasfield's interest in the care, custody, and control of Danny is a fundamental liberty interest. Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). However, Brasfield does not even attempt to establish the remaining two factors, as required by Mathews. Rather, Brasfield simply asserts that, because the court consolidated the hearings and then

-19-

considered hearsay evidence, a denial of due process has necessarily resulted. By failing to engage in a suitable analysis of the Mathews factors, Brasfield fails to establish a due process claim.

VI

Finally, Brasfield requests an award of attorney fees pursuant to either RCW 26.26.140, which authorizes an award of attorney fees to a prevailing party, or RCW 26.09.260(13), which authorizes an award of attorney fees when a motion to modify a parenting plan is found to be brought in bad faith. Because we affirm the trial court's rulings, Brasfield's claim for relief fails.

Affirmed.

We concur: